Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of
*(Briefly Describe the property to be searched or identify the person by name and address*

Information associated with a Black Samsung Smartphone with IMEI: 353717345176483, that is currently located at the Federal Bureau of Investigation office, 21711 North 7th Street, Phoenix, Arizona 85024

Case No. 24-8002 MB

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of _____ Arizona _____.
(identify the person or describe the property to be searched and give its location):

### As further described in Attachment A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before _____ 1-30-24 _____.
                                                                    *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for 30 days *(not to exceed 30)*
                                          ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  1/16/24  2:28p-              _____
                                                                  *Judge's signature*

City and State:  Phoenix, Arizona _____       Honorable John Z. Boyle, U.S. Magistrate Judge
                                                                  *Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A

## DESCRIPTION OF ITEMS TO BE SEARCHED

a.    TARGET DEVICE – Black Samsung Phone with IMEI 353717345176483



**ATTACHMENT B**

*From 3/1/23 -*
*12/31/23* **ITEMS TO BE SEIZED**

a. All records including call records, text messages, email, device locations, GPS locations, or third-party applications on TARGET DEVICE described in Attachment A that relate to a violation of assault, in violation of Title 18, United States Code, Sections 1152 and 113(a)(6), Assault Resulting in Serious Bodily Injury, and Title 18, United States Code, Sections 1152 and 2241(a), Aggravated Sexual Abuse.

b. Evidence of user attribution showing who used or owned TARGET DEVICE at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, text messages, calls, saved usernames and passwords, and documents;

c. Location

d. Any and all correspondence, including but not limited to telephone calls, messages, chat logs, and emails.

e. Any and all notes, documents, records, instructions, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning assault.

f. Any contacts, friends lists, address books, or related items;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| In the Matter of the Search of | |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address)* | |
| Information associated with a Black Samsung Smartphone with IMEI: 353717345176483, that is currently located at the Federal Bureau of Investigation office, 21711 North 7th Street, Phoenix, Arizona 85024 | Case No.  24-8002MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, SA Francine Silva, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of ___Arizona___, there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §113(a)(6) | Assault resulting in a serious bodily injury |
| 18 U.S.C. §2241(a) | Aggravated Sexual Abuse |

The application is based on these facts:
### As set forth in Attachment C, incorporated herein by reference.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Raynette Logan *RL*
*Sworn Telephonically*

FRANCINE SILVA Digitally signed by FRANCINE SILVA
Date: 2024.01.16 11:00:58 -07'00'
*Applicant's Signature*

Francine Silva, SA, FBI
*Applicant's printed name and title*

Date issued:  1/16/24 2:28pm

*Judge's signature*

Honorable John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

City and State: _Phoenix, Arizona_

## <u>ATTACHMENT A</u>

## DESCRIPTION OF ITEMS TO BE SEARCHED

a.   TARGET DEVICE – Black Samsung Phone with IMEI 353717345176483



## ATTACHMENT B

*From 3/1/23 - 12/31/23*

### ITEMS TO BE SEIZED

a. All records including call records, text messages, email, device locations, GPS locations, or third-party applications on TARGET DEVICE described in Attachment A that relate to a violation of assault, in violation of Title 18, United States Code, Sections 1152 and 113(a)(6), Assault Resulting in Serious Bodily Injury, and Title 18, United States Code, Sections 1152 and 2241(a), Aggravated Sexual Abuse.

b. Evidence of user attribution showing who used or owned TARGET DEVICE at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, text messages, calls, saved usernames and passwords, and documents;

c. Location

d. Any and all correspondence, including but not limited to telephone calls, messages, chat logs, and emails.

e. Any and all notes, documents, records, instructions, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning assault.

f. Any contacts, friends lists, address books, or related items;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

**A SEARCH WARRANT**

I, Francine Silva, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      The facts of this case, as more fully detailed herein, are that on or about September 4, 2023, within the confines of the Gila River Indian Community ("GRIC"), within the District of Arizona, MICHAEL LIETKE violated federal law by assaulting C.M., in violation of Title 18, United States Code, Sections 1152 and 113(a)(6), Assault Resulting in Serious Bodily Injury, and Title 18, United States Code, Sections 1152 and 2241(a), Aggravated Sexual Abuse.  I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device, Black Samsung Phone with IMEI 353717345176483 ("TARGET DEVICE").    During the course of the investigation, investigators learned the TARGET DEVICE was utilized by MICHAEL LIETKE. Further, the TARGET DEVICE is believed to have been used by MICHAEL LIETKE in the days before and after the assault of C.M.  I am requesting that the Court issue a search warrant to search the TARGET DEVICE, which is described further in Attachment A.  The items to be searched for and seized are described in Attachment B.

1

## PRELIMINARY BACKGROUND INFORMATION

2.      Your affiant is a graduate of the FBI Academy in Quantico, VA. Your affiant has been employed with the FBI since December 2020. Your affiant is currently assigned to the FBI Phoenix Division and has primary investigative responsibility in Indian Country matters, to include, violent crimes, such as homicide, sexual assaults, and aggravated assaults. I have been trained in various aspects of law enforcement, including searching and seizing digital media to include telephone and social media content. In addition, I have been involved in multiple investigations in which digital media, including telephones and social media accounts, have been seized, searched, and forensically examined.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, and witnesses. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, Sections 1152 and 113(a)(6), Assault Resulting in Serious Bodily Injury, and Title 18, United States Code, Sections 1152 and 2241(a), Aggravated Sexual Abuse, is located within the TARGET DEVICE, more fully described in Attachment A, for items listed in Attachment B.

4.      This Court has jurisdiction over these offenses under 18 U.S.C. § 1152 because the below-described events occurred on the GRIC, a federally recognized tribe, and the

victim of this aggravated assault resulting in serious bodily injury is an GRIC enrolled member.

**DETAILS OF THE INVESTIGATION**

5.      On September 10, 2023, Gila River Police Officers were dispatched to a house on South Mendoza Street, Chandler, Arizona, which is within the jurisdictional boundaries of the Gila River Indian Community, in reference to a call for a welfare check. Gila River Police Officer Gabriel Bustillos responded to the dispatched location and made contact with two individuals at the front door of the residence, later identified as C.M. and her boyfriend, MICHAEL LIETKE.  Both individuals stated they were okay, and Officer Bustillos then asked MICHAEL LIETKE to step inside the residence so he could speak to C.M. alone.

6.      When MICHAEL LIETKE went inside the residence, C.M. informed Officer Bustillos that MICHAEL LIETKE had physically assaulted her in her residence on September 4 after a verbal argument had happened between the two of them. C.M. said MICHAEL LIETKE had struck her in the face with open and closed fists, which resulted in her suffering a broken nose. On September 5, another verbal argument in the residence between the two lead to MICHAEL LIETKE striking C.M. in the face with closed fists to her facial and torso area. C.M. assumed the fetal position on the master bedroom closet floor where MICHAEL LIETKE repeatedly kicked her in her rib area then proceeded to grab a leather belt and strike her across her body multiple times with it. After the physical assault concluded, MICHAEL LIETKE grabbed C.M. by her hair, dragged her onto the master bedroom bed, and proceeded to have sexual intercourse with her against her will.

3

7.     The following day, C.M. was taken to Banner Ocotillo Medical Center where she was told by MICHAEL LIETKE to disclose to the hospital that her injuries were caused by a motor vehicle accident. C.M. was seen by medical staff at the hospital and was discharged with numerous injuries.

8.     A review of C.M.'s hospital records from this incident indicated she suffered bilateral black eyes, a nasal fracture, rib fractures, transverse process fractures, and an indeterminate aged T12 fracture. There were no injuries that the hospital felt required surgery. The records also showed C.M. was admitted on September 5, 2023, at 8:06 PM, and discharged on September 6, 2023, at 12:11 AM.

9.     After being discharged from the hospital and returning to her residence, C.M. stated MICHAEL LIETKE took her cell phone, wallet, keys, and would not let her have unmonitored contact with her family or leave the residence on her own. MICHAEL LIETKE threatened to kill her if she reported him to the authorities. C.M. eventually was able to acquire her phone and sent a text message to her son with instructions to have the police conduct a welfare check on her at the residence.

10.     Officer Bustillos then spoke to MICHAEL LIETKE about the injuries to C.M. He stated she acquired the injuries from a motor vehicle accident and that no police report was filed for the accident. MICHAEL LIETKE also denied any physical altercations ever having occurred between C.M. and himself.

11.     C.M. then showed Officer Bustillos where the assault had taken place inside of the residence and some spots that appeared to be blood, which she asserted were from the assault.

4

MICHAEL LIETKE was then detained by Officer Bustillos and read his Miranda Rights. MICHAEL LIETKE then agreed to answer questions without the presence of his attorney and was then asked about the red spots in the residence and to elaborate on his knowledge about the injuries to C.M. MICHAEL LIETKE then stated that C.M. had been out drinking with one of her friends when she was attacked by multiple females, and she was not being truthful about this situation. MICHAEL LIETKE was then transported to the Gila River Indian Community Police Department.

12.    Gila River Police Department (GRPD) Detective Kevin Rivers and FBI SA Devin Moynihan were informed of the situation and responded to the residence. When Detective Rivers arrived at the residence, C.M. was inside and was being checked on periodically by the officers still at the residence. Detective Rivers was informed that C.M. had signed a consent to search form allowing for the collection of possible evidence from her residence. Soon after, Gila River Crime Scene Specialist (CSS) Morgan Jaecks arrived at the residence. C.M. advised Det. Rivers that the incidents occurred in the master bedroom area of the residence. C.M. advised that she had been punched, kicked, and beaten with a belt by MICHAEL LIETKE, and had suffered multiple injuries including a broken nose, broken ribs and fractures in her back. C.M. informed Detective Rivers she had discharge paperwork from the hospital detailing her injuries. C.M. showed Detective Rivers, CSS Jaecks, and SA Moynihan where the incidents had occurred. CSS Jaecks took photographs, swabs of the spots that appeared to be blood, and two belts.

13.     C.M. was then asked if she would consent to being transported to the Gila River Family Advocacy Center to be interviewed by Detective Rivers and SA Moynihan, and to be given a SANE examination. C.M. consented and was transported to the advocacy center.

14.     When C.M. arrived at the advocacy center she was interviewed by Detective Rivers and SA Moynihan. C.M. provided her biographical information and MICHAEL LIETKE's telephone number of (779) 435-3162.  C.M. said she asked her son to contact the police because she was in fear for her life because MICHAEL LIETKE had threatened to kill her. C.M. was then asked to describe all of the events leading up to, and including, the assault. C.M. stated she and MICHAEL LIETKE had been in a romantic relationship for approximately 10 months, and he lived with her at her residence. On Sunday, September 3, he had pushed her down on the ground, and she had landed on her butt and back. On Monday, September 4, she and MICHAEL LIETKE had left the residence to get food and to go to the residence of R.W., who was a relative of C.M.',s to drink. After C.M. and MICHAEL LIETKE returned to their residence, an argument ensued over the location of MICHAEL LIETKE's phone, and that is when the assault began. MICHAEL LIETKE had repeatedly struck her, kicked her, and whipped her with a belt. Then he dragged her onto the master bedroom bed. While on the bed, MICHAEL LIETKE had choked her and proceeded to have vaginal intercourse with her. C.M. stated she continuously tried to push MICHAEL LIETKE off her and told him, "No. Get off of me".

15.     On what she believed was Wednesday, C.M. was in a lot of pain and knew she needed to go to the hospital. She was unable to travel on her own, and she was told by

MICHAEL LIETKE that he would not take her to the hospital unless she made up a story about how she acquired her injuries. Therefore, when the hospital personnel asked C.M., she told the medical staff she had been assaulted by several females. While at the hospital, C.M. learned she had suffered a broken nose, broken ribs, fractures to her back, and bruising to her face. When she was discharged from the hospital, she was taken back to her residence. Sometime during the morning on Wednesday, while she was sleeping and under the influence of her pain medication, MICHAEL LIETKE mounted her and engaged in sexual intercourse with her. C.M. stated she told him to get off of her and that he was hurting her.

16.     After interviewing C.M., Detective Rivers and SA Moynihan went to the Gila River Police Station to conduct an interview with MICHAEL LIETKE. Miranda Rights were read to MICHAEL LIETKE by Detective Rivers, and he agreed to speak with the law enforcement officers without the presence of legal counsel. He provided his biographical information to include his telephone number of (779) 435-3162 and stated one of the Gila River Officers currently had his cellular device. MICHAEL LIETKE was then asked to describe the events of the previous week leading up to the present. He stated that on Sunday, September 3, he and C.M. had gone out drinking with her aunt and uncle. As they were leaving the bar where they were located, C.M. ran into her friend S.V., and they exchanged phone numbers. MICHAEL LIETKE and C.M. then left the bar and returned to their residence. C.M. told MICHAEL LIETKE that same evening that she was going to go out drinking with S.V. and her boyfriend. When S.V. arrived at the residence, MICHAEL LIETKE told them to leave, or he was going to call the police. C.M. left the residence with

S.V., and MICHAEL LIETKE stayed at the residence. At approximately 2:30 AM the following morning, he received a call from C.M. where she told him she had been beaten up by two women. She told him she was near Broadway and McDowell in Mesa, and to come pick her up. MICHAEL LIETKE looked up the location on his GPS and drove there to pick up C.M. He mentioned it was near a "Circle K" gas station. MICHAEL LIETKE wanted to take C.M. to the hospital that morning, but she refused. When he asked her what had happened, she told him she was hanging out with her friend S.V., left to do her own thing, and she was attacked. MICHAEL LIETKE later stated he found her at the "Circle K" gas station. She told him she didn't remember where exactly she was when she was attacked. He said her eyes looked bloodshot, her knees were scrapped up, and she had some bruises. He did not see any blood on her. He took her home, then gave her some Ibuprofen and they went to sleep.

17.    The next day, Tuesday, September 5, C.M. was complaining about how her ribs were hurting, and MICHAEL LIETKE took her to the hospital. The doctor asked C.M. if she wanted to make a police report, and she told them that she did not. The doctors told C.M. that she had a fractured nose, three fractured ribs, and a fractured spine. They also told her she did not require surgery. MICHAEL LIETKE took C.M. back to the residence and took the rest of the week off work so he could care for her.

18.    On the night of September 9, they got into an argument at their residence regarding one of his ex-girlfriends. They went outside to smoke and after they went back inside, the police arrived. C.M. went outside to speak with the officers. MICHAEL LIETKE then went

8

outside and asked what was happening. One of the officers then asked him to get inside of the police car, and he was driven over to the police station and stayed inside of the vehicle until shortly before the interview.

19.     When asked, MICHAEL LIETKE said he and C.M. do have a physical sexual relationship. The last time he remembers having sexual intercourse with C.M. was Thursday or Friday of that week. When the two of them engage in sexual activities, it does not get aggressive. MICHAEL LIETKE also stated C.M. has never told him no during any of their sexual encounters. When asked about the comments made by C.M. of physical and sexual assault that occurred on Sunday and Monday, he denied ever having hit or sexually assaulted her at any point throughout their entire relationship. He also denied ever having threatened her with violence. He was unsure why she would claim that he was the cause of her injuries. When asked about the appearance of blood in the residence, he did not remember any blood on her or anywhere in the residence. Later he did remember some dried blood on her head from the bump she had. He did not remember seeing any blood in the residence and if he had, he would have cleaned it.

20.     Once the interview with MICHAEL LIETKE had concluded, Detective Rivers and SA Moynihan were informed that the Cellular device he surrendered to the Gila River Police Department when he was taken into custody was entered into evidence at the police department.

21.     On September 11, Detective Rivers and CSS Jaecks visited C.M. at her residence to ask if they could take photographs of her medications prescribed by the hospital in addition

9

to asking some follow-up questions regarding the incident that had occurred between her and MICHAEL LIETKE. C.M. consented and she was asked if she knew who S.V. was. C.M. stated S.V. was a friend of hers that she had not seen in a while. On Sunday, September 3, while at a bar called "Zipps" with R.W. and MICHAEL LIETKE, she had run into S.V. and the two of them had exchanged phone numbers. C.M. also invited S.V. to come to her residence later to drink. When S.V. arrived at the residence, C.M. and MICHAEL LIETKE were arguing and that is when he mentioned calling the police. S.V. then left the residence, and C.M. stayed at the residence with MICHAEL LIETKE. The two continued arguing and eventually went to sleep.

22.     C.M. continued by saying that on Monday, September 4, she told MICHAEL LIETKE about her back hurting. The two of them went out to eat, they then came back to the residence, then C.M. called R.W., and she and MICHAEL LIETKE went over to R.W.'s residence to drink. When the two of them returned to her residence, MICHAEL LIETKE stumbled out of his truck in the driveway. An argument ensued between the two of them because he could not find his phone and assumed she had taken it. Then he assaulted her inside of the residence. The next morning, on Tuesday, September 5, C.M. woke up and texted her boss that she was not going to come in to work that day. C.M. then went outside to look for MICHAEL LIETKE's phone and was able to locate it under his truck. The rest of the day, C.M. stated she could barely move and eventually told MICHAEL LIETKE that she was going to drive herself to the hospital. He told her she was not going alone and told her she had to make up a story about her injuries.

23.     On September 13, Detective Rivers and SA Moynihan met with S.V. at her place of work for an interview. S.V. was asked to describe the last time she saw C.M., and she stated it was on Sunday, September 3. She first saw C.M. at a bar called "Zipps," located in Chandler, Arizona. While at the bar, C.M. told S.V. to come over to her residence later that same day. S.V. tried calling C.M. around 6:00 PM that day, but C.M. didn't answer the phone. S.V. arrived to C.M.'s residence at approximately mdnight. When S.V. arrived at the residence, she saw C.M., MICHAEL LIETKE, and what she thought was a third person, standing outside on the porch of the residence. As she approached the residence, MICHAEL LIETKE made contact with her and told her she needed to leave because the police were on their way to the residence. S.V. went back to her vehicle and left the residence. S.V. stated that C.M. did not leave the residence with her that night, and she had not spoken to C.M. since that night.

24.     After speaking with S.V., Detective Rivers and SA Moynihan, went to speak with C.M. at her residence. After making contact with her, she was asked if there had been another person with her and MICHAEL LIETKE on the night of Sunday, September 3. C.M. stated she and MICHAEL LIETKE were the only two people at the residence when S.V. arrived. After S.V. left the residence, C.M. remained at the residence for the rest of the night and did not leave the residence without MICHAEL LIETKE the following week. At the end of the interview, C.M. was asked if she would consent to a search of her phone via a forensic download. C.M. agreed and arrangements were made to return to her residence the following morning and retrieve her phone.

11

25.     On September 14, Detective Rivers and SA Moynihan returned to the residence of C.M. to retrieve her phone. C.M. gave her phone to SA Moynihan and signed a form consenting to the search. The phone was taken to the FBI Phoenix Field Office where it was forensically downloaded. After the download was complete, the phone was returned to C.M. by SA Moynihan that same day.

26.     During a course of review of the forensically examined cellular device belonging to C.M., described as purple iPhone 14 pro with clear case, SA Moynihan and your affiant were able to identify multiple phone-call log data, chat data, contact information data, and device location data stored on the device.  A review of the device's contact information revealed a listed number of (779) 435-3162 with the monikers "Babe" and "Gucci". This was the same number provided during the interviews of C.M. and MICHAEL LIETKE as the cellular telephone number belonging to MICHAEL LIETKE. Based on the aforementioned factual information, there is probable cause to believe the number (779) 435-3162 is associated with MICHAEL LIETKE and the TARGET DEVICE which he turned over to the Gila River Police Department when he was taken into custody.

Name:                Gucci
Device description:
Source:              Recents
Account:
Group:
Created:
Modified:
Last time contacted:
Times contacted:
Extraction:          Legacy
Manually decoded:    False
Source file:         00008120-001E10CA3C9B401E_files_aiq.zi
                     p/private/var/mobile/Library/Recents/
                     Recents-wal : 0x14EE15 (Table: contacts;
                     Size: 1404952 bytes)

Name:                Babe
Device description:
Source:
Account:
Group:
Created:             8/14/2023 3:30:12 PM(UTC+0)
Modified:            9/14/2023 8:00:04 AM(UTC+0)
Last time contacted:
Times contacted:
Extraction:          Legacy
Manually decoded:    False
Source file:         00008120-001E10CA3C9B401E_files_aiq.zi
                     p/private/var/mobile/Library/
                     AddressBook/AddressBook.sqlitedb-wal :
                     0x180D99 (Table: ABPerson; Size: 2488512
                     bytes)
                     00008120-001E10CA3C9B401E_files_aiq.zi
                     p/private/var/mobile/Library/
                     AddressBook/AddressBook.sqlitedb :
                     0x5677B (Table: ABMultiValue; Size:
                     708608 bytes)

| Interaction Statuses | Interaction Statuses |
| --- | --- |
| Additional info | Additional info |
| Details | Details |
| +17794353162 | User ID  50A1031E-0A31-45AE-B305-C1D287569... |
|  | General  +17794353162 |

27.    A review of C.M.'s device call log data showed numerous calls made to and received from the number (779) 435-3162. The most recent call was on September 4 at 11:45:24 AM, where C.M.'s cellular device received a call from (779) 435-3162. However, there was no record of a call on the device of C.M. to or from (779) 435-3162 around the time MICHAEL LIETKE described receiving a call from C.M. asking him to pick her up because she had been assaulted. Based on the aforementioned information, there is probable cause to believe the TARGET DEVICE was in use until September 4 at 11:45:24 AM, which

13

is after MICHAEL LIETKE described the incident with C.M. having occurred.



| # | | | | | Parties | | ↓ Timestamp | | Duration | | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | From: +17794353162  Babe | | 9/4/2023 6:45:24 PM(UTC+0) | | 00:00:00 | | Missed | |
| 2 | | | | | To: +17794353162  Babe | | 9/3/2023 8:25:52 PM(UTC+0) | | 00:00:00 | | Not answered | |
| 3 | | | | | To: +17794353162  Babe | | 9/2/2023 12:17:37 AM(UTC+0) | | 00:14:28 | | Answered | |
| 4 | | | | | To: +17794353162  Babe | | 9/1/2023 10:51:25 PM(UTC+0) | | 00:14:02 | | Answered | |
| 5 | | | | | From: +17794353162  Babe | | 9/1/2023 1:01:23 AM(UTC+0) | | 00:13:26 | | Answered | |
| 6 | | | | | From: +17794353162  Babe | | 9/1/2023 12:29:57 AM(UTC+0) | | 00:11:17 | | Answered | |
| 7 | | | | | From: +17794353162  Babe | | 8/31/2023 8:31:12 PM(UTC+0) | | 00:00:00 | | Not answered | |
| 8 | | | | | To: +17794353162  Babe | | 8/31/2023 6:09:21 PM(UTC+0) | | 00:00:04 | | Answered | |
| 9 | | | | | To: +17794353162  Babe | | 8/30/2023 5:48:07 PM(UTC+0) | | 00:00:03 | | Answered | |
| 10 | | | | | To: +17794353162  Babe | | 8/30/2023 9:07:59 AM(UTC+0) | | 00:00:20 | | Answered | |
| 11 | | | | | To: +17794353162  Babe | | 8/30/2023 7:22:36 AM(UTC+0) | | 00:00:02 | | Answered | |
| 12 | | | | | To: +17794353162  Babe | | 8/30/2023 7:21:44 AM(UTC+0) | | 00:00:04 | | Answered | |
| 13 | | | | | To: +17794353162  Babe | | 8/30/2023 3:00:56 AM(UTC+0) | | 00:00:04 | | Answered | |
| 14 | | | | | To: +17794353162  Babe | | 8/30/2023 3:00:17 AM(UTC+0) | | 00:00:03 | | Answered | |
| 15 | | | | | From: +17794353162  Babe | | 8/30/2023 12:49:15 AM(UTC+... | | 00:00:00 | | Not answered | |

28.   A review of the device's Location data revealed numerous locations and associated time stamps. On September 3, 2023, from 3:58:56 PM through 6:04:56 PM, the location coordinates for the cellular device place it in the vicinity of "Zipps Sports Grill".   Following the aforementioned location, the device revealed the other location frequented from 09/03/2023 @ 20:57 to approximately 09/04/2023 @ 17:12 by C.M was on Mendoza St., Chandler, AZ, at her residence. C.M remained at her residence during the time MICHAEL LIETKE described being away from the residence.

29.   A review of the device's voicemail data revealed numerous voicemails left by MICHAEL LIETKE to C.M. On August 8, MICHAEL LIETKE states, "I got proof of all that, I didn't delete all my messages just like you have I still have... 8 thousand messages from you".   Based on the voicemail left by LIETKE there is probable cause that all text messages and phone calls made to and from C.M. will not be deleted from the TARGET DEVICE.

14

30. Based on the aforementioned factual information, there is probable cause that all text messages and phone calls made to and from C.M. may be contained on the evidence that has been collected in this investigation. As such, your Affiant requests the issuance of a search warrant for the TARGET DEVICE to collect any available evidence pertaining to the aggravated assault of C.M.

**CONCLUSION**

31. Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts as set forth in this affidavit, there is sufficient probable cause to believe a violation of Title 18, United States Code, Sections 1152 and 113(a)(6), Assault Resulting in Serious Bodily Injury, and Title 18, United States Code, Sections 1152 and 2241(a), Aggravated Sexual Abuse, has been committed, and evidence of the crime will be found in the cellular device described in this Affidavit and Attachment A. I believe the time, date, the duration of incoming and outgoing calls to the cellular phone, incoming and outgoing text messages, device locations and other electronic data as listed in Attachment B, will be located on the cellular device. Wherefore, your affiant respectfully requests a warrant be issued authorizing Special Agents to examine, analyze, and make record of the contents of the information stored in the seized cellular telephone described in this Affidavit and Attachment A. This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:_____

FRANCINE SILVA  Digitally signed by FRANCINE SILVA
Date: 2024.01.16 11:02:06 -07'00'

Special Agent Francine Silva
Federal Bureau of Investigation

Subscribed and sworn to before me this ___16___ day of January, 2024

Honorable John Z. Boyle
United States Magistrate Judge
District of Arizona

16